THE AMERICAN BRASS COMPANY *v.* TORRINGTON
BRASS WORKERS' UNION LOCAL 423, INTER-
NATIONAL UNION OF MINE, MILL AND
SMELTER WORKERS

INGLIS, C. J., BALDWIN, O'SULLIVAN, WYNNE and DALY, Js.

Argued June 9—decided July 23, 1954

*Samuel Gruber,* for the appellant (defendant).

*William J. Larkin, 2d,* with whom, on the brief, was *Walter M. Pickett, Jr.,* for the appellee (plaintiff).

O'SULLIVAN, J. In conformity with § 8161 (d) of the General Statutes, the plaintiff addressed an application to the Superior Court to vacate an arbitration award on the ground that the arbitrators had exceeded their powers. The defendant answered, admitting certain allegations and denying others, and added a cross application seeking correction of the award in various ways and confirmation of it as thus amended. The court found that the award should be vacated on the ground alleged and that this finding disposed of the necessity of acting on the cross application. The defendant has appealed from the judgment rendered, assigning as error the court's action in vacating the award and in refusing to grant the cross application.

The following facts are undisputed. On September 17, 1952, the plaintiff and the defendant, hereinafter called the company and the union, entered into a collective bargaining agreement covering rates of pay, hours of work, the right of the company to discharge an employee and the right of the union to submit to arbitration the propriety of the discharge, grievance procedure and other conditions of employment affecting production and maintenance em-

ployees at the company's Torrington division. A dispute arose between the company and the union on January 30, 1953. It concerned the discharge of an employee, designated in the record as Mr. D, who was within the bargaining unit covered by the agreement. His job, classified as hazardous, was on an annealing furnace. D had first been employed by the company in 1939. At that time he had been asked whether he had ever had any epileptic fits or convulsions. His answer to this question had been recorded as "No," although he denied ever having been interrogated on the subject. D left the company's employ in 1942 and entered the United States army. About three months after his induction he had an epileptic attack and, as a result, was given a medical discharge shortly thereafter. On April 29, 1943, he applied for re-employment by the company and was put back on his old job. On November 25, 1952, he was taken to a Torrington hospital, suffering from what his own physician described as epilepsy.

D reported back to the mill on December 8, 1952. At first the company refused to allow him to work on account of the nature of his illness, but because of the approach of the holidays and in order to give him an opportunity to obtain employment elsewhere, the company put him on a job until January 30, 1953, under a waiver signed by him and filed in the office of the workmen's compensation commissioner. On the last-named date, the company terminated D's employment. It was this discharge which brought about the dispute between the company and the union. The dispute was processed in accordance with one of the provisions of the agreement and was submitted to the Connecticut state board of mediation and arbitration, hereinafter called the board,

upon a single issue framed in the following language: "Was Mr. D. discharged by the Company for just and proper cause?" On March 18, 1953, the board held a hearing, and on April 9, 1953, handed down this award: "Mr. D. was not discharged by the Company for just and proper cause." The board filed with the award a "discussion" of the reasons upon which it based the award. That discussion is set forth in full in the footnote.[1] Since 1944 the company has pursued a policy, recommended by its medical department, of terminating the employment

---

[1] "DISCUSSION

"There is no controversy between the parties as to the existence of epilepsy. When it commenced it is not clear and the difficulty of its identification in the ordinary physical exam is evident in the fact that if it existed in 1939 it escaped the Company doctor. Since Mr. D had an attack after a few months in the Army, in all probability the ailment did exist at the time of his induction and did escape notice in his physical exam then, and again it was missed by the Company doctor in 1943 when he returned to the employ of the Company. Noteworthy is the fact that Mr. D testified that he was discharged from the Army in 1943 for epilepsy. When his application for reemployment for the Company was filled out, it was claimed that he never had 'epilepsy fits or convulsions.' Ordinarily, if established, such a falsification would be considered serious. However, this matter is not in question here. It was not the basis of the Company's discharge and before the Board the Company stated: 'We are not claiming falsification here because we have no evidence of it.' (Transcript, page 4)

"The condition of an employee afflicted as Mr. D. poses a problem which a Company must weigh with extreme care. At stake are not only the interests of the Company and the employee, but the obligation of the Company not to jeopardize the safety of other employees by the continued employment of one afflicted with epilepsy. That these interests would be violated by the continued employment of Mr. D in his job in the Tube Mill seems well established in the evidence and the Company had no choice but to terminate him in the job to which he had been assigned.

"To this extent the action of the Company seems not only beyond criticism but commendable. The problem and the dispute arises, however, from the action of the Company in going further, and relying on a general Company policy, completely severing this employee without attempting to fit him to a job which even with his affliction he

of any employee who is found to be suffering from epilepsy. There are many jobs at the Torrington

might satisfactorily perform. This the Union states is wholly unjust and claims further that a man with 13 years of satisfactory service merits greater consideration. Certainly, a discharge today is a vastly more severe penalty than in former years. The value of lost seniority and pension rights after years of service is indeed considerable. And while in the past we have with reservations heard unions at times refer to a discharge as 'economic capital punishment,' there does seem an element of such in this case. Certainly, after having given 13 of his most active years of work service to this Company, service with which the Company has been satisfied, this employee with this unusual handicap faces an unpromising employment future.

"On the other hand, the Board is not unmindful of the problem the continued employment of an epileptic raises for the Company. In an Award in a similar case (Case No. 188-5253) this Board upheld a discharge in somewhat similar circumstances. However, in that case one factor was present which is not present in this case. There the Company had surveyed the possibilities of employment in non-hazardous jobs with the Company, and for good reason had found such employment impossible.

"Unfortunately, in the instant case such is not the fact. The Company inflexibly executing a policy laid down by the Medical Department, discharged this employee with no consideration of employment on a non-hazardous job which he might be capable of performing. The Company states this was a matter of general Company policy over which the Industrial Relations Department had no control. Further, before the Board the Company stated that under the Walsh-Healey Act its operations are considered hazardous and there could be no reasonable departures from this policy. With this position the Board does not agree. The Board does not question the fact that the vast majority of the jobs with the Company are hazardous, and jobs in which the Company might have no right to employ Mr. D. However, the Board does believe that there do exist jobs, and before the Board the Union listed a considerable number, which Mr. D might be capable of performing satisfactorily, without hazard, and with a waiver of responsibility to the Company. The general policy of the Medical Department notwithstanding, and reason dictates that there should be reasonable exceptions from every rule, the service of this employee with the Company and the claims thereby established should give him a right to such consideration, a consideration which it seems should move the Company to make every effort to review the job possibilities of this man with the Union and to take care of him in its employ if such is at all possible.

"The Board is asked to decide whether or not the discharge was for

division which are nonhazardous in nature, and D could handle them without danger to himself or to his fellow employees. At the time of his discharge he had built up a thirteen-year seniority and had earned more than half of his pension rights, all of which would be lost to him if he were discharged.

On the basis of the foregoing, the court vacated the award, after first concluding that the arbitrators had exceeded their powers. The company maintains that the court's judgment was correct since article II of the collective bargaining agreement provides that the company shall retain the right to discharge its employees for "proper cause" and since "proper cause" for D's discharge can be supported by either of two reasons. The first reason is that D made "an incorrect answer to a pertinent question in his employment questionnaire; i. e. he knew that he had epilepsy when he was re-employed after discharge from the Army for epilepsy." Apparently the assertion of fraud is advanced for the first time in this court and is so utterly inconsistent with the prior position of the company that it should receive a summary disposition. At the time of the hearing before the board, the representative of the company, when referring to the reasons which impelled the company to terminate D's employment, expressly disclaimed any purportedly incorrect or false statement made by D in applying for work, originally or after his

---

'just and proper cause.' Although at times epilepsy seriously handicaps the usefulness of any employee, it does not absolutely and without qualification constitute a sound basis for discharge. Each case must be examined in all its circumstances, and the circumstances in this case, as presently established, do not justify the action of the Company. Wherefore, on the basis of all of the above, the Board makes the following

"AWARD

"Mr. D. was not discharged by the Company for just and proper cause."

tour of duty in the army. The record shows that the representative then said: "We're not claiming a falsification here because we have no evidence of it." The board had the right to accept that statement at full value and to exclude from consideration the reason now forced upon us. The company cannot, on appeal, raise a claim which it not only failed to present to the board but which it, in fact, expressly disavowed. We emphasize this in order to eliminate from the case fraud in any form. Indeed, the company itself has removed it.

The second reason advanced by the company in support of the court's action is that, because of the hazardous nature of the manufacturing of brass and copper products, D's epilepsy, manifested to the company for the first time during December, 1952, was a proper cause for his discharge. It is this claim which presents the decisive issue in the appeal.

The parties contemplated the possibility that disputes of various kinds would arise between them during the life of the collective bargaining agreement. Accordingly, they provided two distinct methods by which their controversies, if any, should be submitted to arbitration. The method pertinent to the case at bar deals exclusively with and is available only for those disputes growing out of the discharge by the company of any of its employees. Article VII (4) provides that "[i]n the case of a dispute as to the justice of Company action in a discharge case, the parties will accept the decision of an Arbitrator to be named by the Connecticut State Board of Mediation and Arbitration." [2] The obvious

---

[2] No claim was advanced by either party that there was any deviation from the terms of article VII (4) in the procedure of submission or of rendering the award, or that the arbitration was not controlled by the principles applicable to private arbitration under a submission pursuant to contract.

purpose of this and of article II was a concession on the union's part that the company had an untrammeled right to discharge any employee for proper cause, and a concession on the company's part that the discharge would not be valid if, on submission to an arbitrator, he found it to be unjust.

The arbitration board to which the dispute over D's discharge was referred was entitled to exercise only such power as the agreement of the parties authorized. It is elementary that the charter of an arbitrator is the submission and no matter outside the submission may be included in the award. *Pratt, Read & Co.* v. *United Furniture Workers,* 136 Conn. 205, 208, 70 A.2d 120. Indeed, the basic test of the validity of an award lies in its conformity to the submission. *Chase Brass & Copper Co.* v. *Chase Brass & Copper Workers Union,* 139 Conn. 591, 594, 96 A.2d 209. The submission in the case at bar read: "Was Mr. D. discharged by the Company for just and proper cause?" The award of the board was that "Mr. D. was not discharged by the Company for just and proper cause." On its face, the award, with its categorical answer to the question propounded, would appear to be in the strictest conformity with the submission.

The company attacks the award, however, on the theory that the board's discussion, accompanying the award, demonstrates an erroneous ground upon which the board reached its conclusion. The company's argument in this regard seems to assume that the decisive question before the board was whether D had epilepsy, and that once this fact had been established, as concededly it was, it automatically followed that, in terminating his employment, the company acted upon proper cause, and, hence, that the award was beyond the board's power to

make. Such, however, is not the case. The matter of D's epileptic affliction is important, to be sure, but it is not at all controlling. It was a factor for consideration only so far as it and all other circumstances might be used for the purpose of determining whether the discharge was unjust.

There is some question whether the board's discussion, accompanying the award, can be used for the purpose to which the company has put it. Ordinarily, the memorandum of an arbitrator is irrelevant. *In re Curtis-Castle Arbitration,* 64 Conn. 501, 513, 30 A. 769; *Chase Brass & Copper Co.* v. *Chase Brass & Copper Workers Union,* supra, 597; see *Matter of Allen (Jayne),* 279 App. Div. 444, 446, 110 N.Y.S.2d 609. It is the award, rather than the finding and conclusions of fact, that controls. *United States Time Corporation* v. *Waterbury Watch Workers Union,* 15 Conn. Sup. 391, 395.

But, if we assume the right to examine the board's discussion, we find that it gave to the factor mentioned above the utmost value to which it was entitled under the submission. The board recognized the inherent danger, both to D himself and to his fellow workers, in keeping an epileptic at an annealing furnace, and commended the company for taking D off that job; it also took account of the length of D's service and of the loss of seniority and of pension rights which his discharge would entail; and its ultimate conclusion was reached, as the discussion discloses, by finding that, in discharging D, the company gave no consideration to the possibility of keeping him employed at a nonhazardous job but let him go merely because an inflexible rule required, as a matter of policy, the discharge of all epileptics, whatever might be the degree of their illness or the prior service rendered or the

economic catastrophe suffered by the employee. There is nothing inconsistent between the fact of D's epilepsy and the award, nor is the award the result of erroneous reasoning. For a comparable situation, see *Niles-Bement-Pond Co.* v. *Amalgamated Local 405,* 140 Conn. 32, 38, 97 A.2d 898.

As previously stated, the union filed a cross application wherein it sought a correction of the award to provide for reinstatement of D with back pay, and as corrected, a confirmation of the award, or, in the alternative, for a confirmation of the award as made. Our view of the case makes judicial correction of the award impossible. There was no mention in the submission of the question whether D was entitled to reinstatement and back pay. It was, therefore, not within the power of the board to decide that question. The most that the board decided was that the discharge of D was unjust. Whether D will ultimately be entitled to reimbursement and back pay must await the result of future events. The most that we can do is to order the confirmation of the award as rendered.

There is error, the judgment is set aside and the matter is remanded with direction to render judgment dismissing the plaintiff's application and confirming the award.

In this opinion the other judges concurred.