THE NEW BRITAIN MACHINE COMPANY *v.* LODGE 1021, INTERNATIONAL ASSOCIATION OF MACHINISTS

INGLIS, C. J., BALDWIN, O'SULLIVAN, WYNNE and DALY, Js.

Argued April 10—decided May 16, 1956

*William S. Gordon, Jr.,* with whom was *William P. Aspell,* for the appellant (defendant).

*John N. Cole,* with whom, on the brief, was *David F. Babson, Jr.,* for the appellee (plaintiff).

BALDWIN, J. The New Britain Machine Company, referred to herein as the company, brought an application under § 8161 of the General Statutes for an order to vacate an award made in an arbitration between the company and Lodge 1021 of the International Association of Machinists, referred to herein as the union. The court granted the application

and vacated the award. The union has appealed. The issue presented on the appeal is whether the arbitrators exceeded their powers.

The company is a manufacturer and employs a number of workers who are represented by the union. The company entered into a contract on March 22, 1954, with the union concerning the wages, hours and working conditions of its employees belonging to the union. The contract provided a procedure for the settlement of grievances and defined a "grievance" as "any dispute between the parties concerning the interpretation or application" of the contract, "including any alleged violation of it." The procedure included a prescribed course of negotiation and arbitration for settling grievances. Concerning the powers of arbitrators, it was stated: "The arbitrators are not authorized to add to, modify or take away from the express terms of this agreement and shall be limited to the interpretation or application of the provisions of this contract or the determination if there is a violation of this agreement. Any decision of a majority of the arbitrators within the scope of the above authority shall be final and binding on both parties."

The contract established certain seniority rights for employees belonging to the union and stated that stewards and shop chairmen should have top seniority on shifts, and that in the event of layoffs top seniority would be accorded to stewards, shop chairmen and union officials upon request of the union. It also provided: "The management of the Company and the direction of the work force, including the right to hire, suspend or discharge for proper cause or to transfer, the right to relieve employees because of lack of work or for other legitimate reasons and the right to determine the extent to which the plants

shall be operated including the determination of shift hours, is reserved exclusively in the Company subject to the conditions herein provided. Any proposed changes in shifts or work schedules will be discussed beforehand by the Company with the Union Committee." Another term of the contract stated that no alteration or amendment of it should be binding unless made and executed in writing.

The company assigned and transferred certain of the employees in one of its departments from the operation of automatic screw machines to chucking machines. The union claimed that these assignments and transfers were not in the order of seniority. Thereupon the company, claiming that it was within its rights, prepared a written memorandum, dated April 6, 1954, of a verbal agreement made with representatives of the union which contained a procedure for assigning employees to the chucking machines. A copy of this memorandum was sent to the president and other representatives of the union. The memorandum stated that the company, using seniority, could assign automatic screw machine operators to chucker work and that if an employee refused this work he could be laid off.

Michael Fahey was an automatic screw machine operator and also knew how to operate a chucking machine. He was a member and officer of the union. The company gave him the option of either accepting an assignment to a chucking machine job or taking a layoff. Fahey claimed that as a union officer he had top seniority and should be the last screw machine operator to be assigned to a chucking machine. He refused to take the assignment. The company laid him off. The union filed a grievance protesting the layoff. When the grievance was not settled by negotiation, it was referred to arbitration

under the contract. By agreement, the grievance was submitted to the arbitrators in the following form: "Was Michael Fahey's layoff on August 20, 1954 proper under the terms of the Agreement between the parties dated March 22, 1954? If not, to what remedy is he entitled?"

After a hearing, an award was made in the following language: "Michael Fahey's layoff on August 20, 1954 was not proper under the terms of the Agreement between the parties dated March 22, 1954. He is entitled to compensation for the loss of earnings thus caused him." The arbitrators filed written opinions with the award. The pertinent portion of the opinion of the majority of the board is set forth in a footnote.[1] The company claims that this opinion demonstrates that the memorandum of

---

[1] "Article IX, Paragraphs J and K [of the union contract] give committeemen top seniority in the event of a layoff. The April 6, 1954 memorandum gives the men on the automatics the right to refuse work on the chuckers and to take a layoff instead. Fahey refused work on the chuckers, as was his right. By the terms of the April 6 agreement he thereby went on layoff status. But the terms of Article IX, Paragraphs J and K immediately applied to him; as a committeeman he could not be laid off while others were working because he had top seniority. Hence his status as an automatic screw machine operator remained undisturbed and the Company's action in laying him off was improper.

"No other interpretation gives effect both to the April 6 memorandum and Article IX, Paragraphs J and K of the Agreement. The memorandum was clearly designed to give surplus employees on the automatics the option of going on layoff or doing the chucking work. This option was to be extended no less to Fahey than to others. His choice was not to work on the chuckers. But Article IX gives Fahey, a committeeman, protection against layoffs by conferring top seniority on him. Hence when a layoff confronted him, this favored status came into play.

"We were not impressed with the Company's argument that when Fahey was offered work on the chucking machine, this was an assignment from one job to another within the classification. The fact is that he was offered chucking work because there was a surplus of automatic operators and the Company in the April 6 memorandum

April 6, 1954, was the vital factor in the decision of the arbitrators and that they did not limit themselves to the application and interpretation of the contract. In short, the award was not within the terms of the submission.

The charter of an arbitrator is the submission, and no matter outside the submission may be included in the award. *Local 63, Textile Workers Union* v. *Cheney Bros.*, 141 Conn. 606, 613, 109 A.2d 240. "[T]he basic test of the validity of an award lies in the conformity to the submission." *American Brass Co.* v. *Torrington Brass Workers' Union*, 141 Conn. 514, 521, 107 A.2d 255. The award made was precisely in the terms of the submission. The company claims, however, that the award was reached by an interpretation of the memorandum of April 6, 1954. The arbitrators filed a written opinion in which this memorandum is discussed, and the company asserts that the interpretation which the arbitrators placed upon it is the basis of the award. We said in *In re Curtis-Castle Arbitration*, 64 Conn. 501, 513, 30 A. 769, that an award need contain no more than the actual decision of the arbitrators and that the means by which they reach the award, unless the submission requires otherwise, is needless and superfluous. It is not necessary to decide now whether this still holds true. Ordinarily, the award rather than a finding of facts and conclusions controls. *American Brass Co.* v. *Torrington Brass Workers' Union*, supra, 522; Sturges, Commercial

had circumscribed its right to make transfers under these circumstances to cases where the employee assented.

"Nor do we believe that in agreeing to the April 6 memorandum the parties impeached the top seniority principle. Top seniority is conferred by a basic Agreement provision, whereas the April 6 memorandum is a supplemental document intended to modify only a narrow aspect of the seniority rules in a specific department."

Arbitrations & Awards, p. 797. Under § 8161 of the General Statutes an award may be vacated, among other reasons, if the arbitrators have exceeded their powers. *Amalgamated Assn.* v. *Connecticut Co.,* 142 Conn. 186, 191, 112 A.2d 501. The company fails to distinguish between mentioning the memorandum of April 6, 1954, and relying upon it. The memorandum had been offered to the arbitrators by the company. A study of the opinion of the arbitrators reveals that while they did consider the memorandum of April 6, 1954, the interpretation which they gave to it was that it did not alter the contract of March 22, 1954, as that contract applied to Fahey's seniority rights. Therefore, the grievance arising out of Fahey's layoff was determined upon the basis of the rights accorded to him by the contract of March 22, 1954. The provisions of the contract relating to seniority controlled over any claimed right of the company to transfer employees from one job to another.

There is error, the judgment is set aside and the case is remanded with direction to render judgment dismissing the plaintiff's application.

In this opinion the other judges concurred.