[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: APPLICATIONS OF PARTIES TO (A) VACATE,MODIFY AND/OR CORRECT ARBITRATION AWARD, AND (B) TO CONFIRMARBITRATION AWARD
On September 16, 1988, Raymond Johnson, Jr., plaintiff herein, was involved in a motor vehicle accident while operating a motorcycle owned by Milford Auto Recycling, Inc., the plaintiff's closely held corporation. The other vehicle involved in the accident was operated by Allison Bache and carried $20,000 in liability coverage. After receiving and exhausting the third party's coverage, Johnson initiated proceedings to compel arbitration pursuant to policy language, against Aetna Casualty 
Surety Company (hereinafter "Aetna") and National Grange Mutual Insurance Company (hereinafter "National Grange"). National Grange had issued a policy to plaintiff's father, Raymond Johnson, Sr., and plaintiff claimed to be an insured under the policy language, "you" or any "family member" defined as "a person related to you by blood, marriage or adoption, who is a resident of your household." Aetna had issued a commercial business auto policy to Milford Auto Recycling, Inc. which contained similar language, that is, "you or any family member". Section D of Endorsement CA 2x 17. CT Page 9156
The arbitration proceedings against both insurers were consolidated, with overlapping but separate panels deciding each claim. Through the course of the arbitration proceedings there were a total of ten hearings involving the testimony of 21 witnesses. Both arbitration panels eventually found the issue of liability in favor of the plaintiff, awarded him damages and determined that Aetna's policy was primary and, further, that its coverage limits exceeded those damages. Plaintiff was the recipient of an award of $430,000 as against Aetna and in favor of National Grange as a secondary insurer whose limits were not reached.
Now pending before the court are three applications, pursuant to the provisions of §§ 52-417 through 52-419 of the General Statutes, arising out of the award of the arbitrators: Aetna's Application to Vacate, Modify and/or Correct, by which Aetna seeks to overturn or reduce the damages awarded against it; plaintiff Johnson's Application to Confirm and/or Modify his award against Aetna, and his Application to Vacate the arbitrator's decision in favor of National Grange in the event that the court vacates or modifies his award against Aetna. The only claims of error in these consolidated proceedings are made by Aetna and are seven in number:
 1. The arbitrator's decision should be vacated because the majority arbitrator's refusal to state the factual and legal basis for their decision has prejudiced the rights of the plaintiff (Aetna).
2. The defendant (Johnson) was not a covered insured.
 3. The motorcycle operated by Johnson was not a covered vehicle under the Aetna policy.
 4. The majority arbitrator's were guilty of misconduct and violated their oath in refusing to consider Aetna's claimed defense that the policy was void due to material misrepresentations made by Johnson on the application for the policy.
 5. The policy was void due to material misrepresentations made by Johnson on the insurance application.
6. The arbitrators failed to reflect the true policy CT Page 9157 limits in that they mistakenly allowed stacking.
7. The partiality of the arbitrators.
The first task facing the court is to apply the appropriate standard or standards of review. The first inquiry, therefore, is whether the arbitration proceeding was consensual or by agreement, as opposed to compulsory or statutorily imposed. "When arbitration is consensual, rather than statutorily imposed, judicial review is limited in scope . . . . If the parties mutually agree to submit their dispute to arbitration, the resulting award is not reviewable for errors of law or fact . . . . Judicial review of unrestricted submissions is limited to a comparison between the submission and the award to see whether, in accordance with the powers conferred upon the arbitrators, their award conforms to the submission."Bodner v. United Services Automobile Assn., 222 Conn. 480, 488
(1992). Such a review is extremely limited in scope and would apply in this court's opinion to all issues other than the issue of coverage.
With respect to the coverage issue, General Statutes § 38a-336(c) provides that:
 "Every automobile liability policy . . . which contains a provision for binding arbitration shall include a provision for final determination of insurance coverage in such proceeding."
It has been held, in light of this provision, that arbitration of insurance coverage issues is compulsory rather than consensual.Bodner, 222 Conn. at 488; Wilson v. Sentry Insurance Group,199 Conn. 618, 622-24 (1986). However, only the coverage issue is compulsory. "The statute does not say, however, and we have never held, that any other issues arising under an uninsured motorist policy are required to be arbitrated." Bodner, supra 488. Thus, liability and damage issues as well as findings of fact in relation thereto are consensual issues.
The court must apply two separate standards to its review of issues of fact and law in relation to the coverage question. While the interpretation and application of law by the arbitrators is subject to de novo review; American Universal Ins. Co. v. DelGreco,205 Conn. 178, 191 (1987); the appropriate standard for review of factual determinations in compulsory arbitration is the identical "substantial evidence" test that prevails in review of CT Page 9158 factual determinations by administrative agencies. Chmielewski v.Aetna Casualty and Surety, 218 Conn. 646, 656 (1991). The substantial evidence test has been fully articulated by the Appellate Court:
 "The test in this context requires that a court determine whether substantial evidence exists in the record to support the [arbitration panel's] findings of basic fact and whether the conclusions drawn from those facts are reasonable . . . . Substantial evidence will be found to exist if the . . . record supplies a substantial basis of fact from which the court can reasonably infer the fact in issue."
Lawrence v. New Hampshire Ins. Co., 29 Conn. App. 484, 490 (1992).
The subject Aetna policy was an assigned policy and contained the Connecticut Uninsured Motorist Endorsement, which provided in pertinent part that Aetna "will pay all sums the insured is legally entitled to recover as damages from the owner or driver of an uninsured motor vehicle . . . ." In defining an "insured" who is entitled to coverage, the policy includes:
1. You or any family member;
 2. Anyone else occupying a covered auto or temporary substitute for a covered auto;
 3. Anyone for damages he is entitled to recover because of bodily injury sustained by another insured.
The arbitrators found separate routes to coverage through both (1) and (2) above. This court agrees. "You" is defined in the Aetna policy as the "named insured" listed as Milford Auto Recycling, Inc. "Family member" is defined as "a person related to you by blood, marriage or adoption who is a resident of your
household, including a ward or foster child." Aetna has taken the position that since the "you" is a corporate entity, an individual such as the plaintiff cannot be an insured. Such an interpretation would render definitional policy language a nullity. Clearly, corporations do not drive motor vehicles. Their officers, directors, stockholders and employees do. The court, in its review of the transcript, has found ample testimony supporting the arbitrators' finding in Paragraph 6 of their award, to wit: that "Milford Auto Recycling, Inc. is a one man corporation. Raymond C. CT Page 9159 Johnson, Jr. served as its President and was the sole owner, stockholder, and employee." Further, the evidence discloses an Equifax Report contained in Aetna's files since 1983 attesting to Aetna's knowledge that Raymond C. Johnson, Jr. was the President of Milford Auto Recycling and that his father, Raymond C. Johnson, Sr. was vice president. (February 18, 1993 T. at 48-49, Exhibit 19).
"It is a basic principle of insurance law that policy language will be construed as laymen would understand it and not according to the interpretation of sophisticated underwriters, and that ambiguities in contract documents are resolved against the party responsible for its drafting." Cody v. Remington Electric Shavers,179 Conn. 494, 497 (1980). A rationale for the rule is that "since one who speaks or writes, can by exactness of expression, more easily prevent mistakes in meaning, than one of those with whom he is dealing, doubts arising from ambiguity are resolved in favor of the latter." Simses v. North American Life Health Ins.,175 Conn. 77, 85 (1978), quoting 4 S. Williston, Contract (3d. Ed. Jaeger 1961) 621, p. 760-61.
The court believes that the case of Ceci v. National IndemnityCo., 225 Conn. 165 (1993) is controlling with respect to the coverage issue in the instant case. There Michael Ceci had sustained injuries as a pedestrian when he was struck by an underinsured motorist. He sought to recover underinsured motorist benefits under a business automobile insurance policy issued by the defendant to Victor Ceci Refuse, Inc., a corporation operated by the plaintiff's family. The National Indemnity policy contained identical definitional language with respect to an "insured", i.e., "you or any family member" and "anyone else occupying a covered auto or a temporary substitute for a covered auto." The Ceci court concluded:
 "Because corporations do not have families, uninsured motorist endorsements containing family member language should not be appended to business automobile liability insurance policies. If they are, then, in keeping with the consumer oriented spirit of the rules of insurance policy construction, the claimed ambiguity should be construed from the standpoint of the reasonable layperson in the position of the insured and not according to the interpretation of trained underwriters."
Ceci v. National Indemnity Co., supra, 174-75. CT Page 9160
The Ceci court went on to state:
 "By inserting a family member provision in the business policy, the defendant has left the Cecis in the unenviable position of having to define the meaning and purpose of the family member language in the context of the policy. This is precisely the problem that the rules of insurance policy construction were designed to avoid. See General Statutes §§ 38a-297 through 28a-299 (Insurance coverage shall be `readily understandable')."
The only effect that a "family member" provision could have in a policy with a corporation as its named insured would be to grant and extend coverage to the corporation's family, that is, its officers, directors and stockholders. Absent such an effect, the family member provision creates an ambiguity as its meaning would be unclear. Parties ordinarily do not insert meaningless provisions in their agreements. Connecticut Co. v. Division 425,147 Conn. 608 (1960). "If it is reasonably possible to do so, every provision of an insurance policy must be given operative effect." Kelly v. Figueiredo, 223 Conn. 31, 36 (1992).
The court finds, therefore, that the Aetna policy provided coverage to Raymond C. Johnson, Jr. pursuant to its policy definition of an insured affording coverage to "you and any familymember." "The language relating to `family member' in a policy insuring a corporation was not required . . . . Without this [language] there would have been no ambiguity." Ceci v. NationalIndemnity, supra.
Much effort has been extended by the parties with respect to the issue of whether the plaintiff's motorcycle was a covered vehicle under the Aetna policy. Ownership of the motorcycle is clearly a factual issue and resolved by the arbitrators in Paragraph 5 of their decision: "On September 16, 1988, the claimant, Raymond C. Johnson, Jr. was operating a 1978 Harley Davidson motorcycle owned by Milford Auto Recycling, Inc." This court, based upon its review of the transcript, believes that substantial evidence exists in support of this finding. Johnson testified that the motorcycle was purchased by Milford Auto Recycling, then refurbished, used and sold by that business. His testimony was corroborated by the testimony of two other witnesses, Messrs. Waterbury[1] and Generous[2]. The transcript did disclose that the police officer was told by Johnson at the scene of the accident that he (Johnson) was the owner. Further, the motor vehicle CT Page 9161 accident report prepared by Mr. Johnson, Sr. due to the serious injuries and lengthy hospitalization of his son, listed Raymond Johnson, Jr. as the owner of the motorcycle. While this evidence might have supported another conclusion as to ownership, the court cannot disturb the arbitrators decision as to ownership, as substantial other evidence exists to support its finding. Under the applicable standard, "a reviewing court must defer to the arbitrator's right to credit testimony in whole, in part, or not at all." Allstate Insurance Co. v. Howe, 31 Conn. App. 132, 135
(1993). Uncontroverted evidence established that Milford Auto Recycling obtained a license plate, DA 223, for the motorcycle from the Department of Motor Vehicles. "Public policy demands that, if a dealer's number plates are affixed to a motor vehicle, they constitute prima facie evidence of the ownership of that vehicle by the dealer to whom those plates were issued." Scolora v.Shaughnessy, 51 Conn. 252, 256 (1963). The conclusion of the arbitrators that the motorcycle was owned by the named insured, Milford Auto Recycling, Inc., will not be disturbed.
The fact of ownership of the vehicle by the named insured alone does not determine whether the motorcycle was a covered vehicle under the policy. Furthermore, vehicle coverage may not be a necessary prerequisite to Johnson's being an insured under the policy:
 "An endorsement that specifically added coverage for `family members', as did this one, would reasonably be understood as providing underinsured motorist insurance for members of the Ceci family independent of whether they were occupying a covered automobile at the time of the injury.
Ceci v. National Indemnity Co., supra at 173. (Emphasis added.) Nevertheless, the court will review the facts to determine whether substantial evidence exists to support the arbitrators' finding that the motorcycle was a covered vehicle.
Section V of the Aetna policy contains the following definition of an auto:
 "`Auto' means a land motor vehicle, trailer or semitrailer designed for travel on public roads but does not include `mobile equipment'."
"Mobile equipment" is defined as "bulldozers, farm machinery, CT Page 9162 forklifts, and other vehicles designed for use principally off public roads, power cranes, shovels, loaders, differs or drills; or road construction or resurfacing equipment such as graders or rollers." Clearly, a motorcycle falls within the policy definition of an auto as it is "a motor vehicle designed for travel on public roads" and does not constitute mobile equipment as that term is defined. The policy's "Schedule of Covered Autos You Own" lists as covered autos: (1) "one set of junk dealer plates", and (2) "A 1977 Ford truck". Under the heading of "Coverage Premiums", a separate charge is listed for each auto's uninsured motorist coverage, $57 for the former and $70 for the latter.
At the time of the accident, the motorcycle had affixed to it a plate, duly issued by the Commissioner of Motor Vehicles and bearing registration DA 223. This plate had been issued to Milford Auto Recycling, Inc., the named insured, pursuant to its junk dealer license. The evidence established that Milford Auto was issued a junk dealer license number D 2564, under which it was entitled to obtain multiple plates for use on vehicles utilized in its business. Several automobile-sized plates were issued to Milford Auto with successive numbers: DC 2564, DD 2564, DE 2564, et cetera, which plates bore the word "Junk". The Department of Motor Vehicles, while willing to issue a motorcycle plate under a junk license, did not have a motorcycle sized plate in the D 2500 series bearing the word "Junk". Nor would a normal-sized D 2500 plate fit on a motorcycle. Thus, when a junk dealer like Milford Auto Recycling wants a motorcycle plate under its junk dealer license, the Department of Motor Vehicles issues a motorcycle plate from its dealer series rather than its junk dealer series. Therefore, Milford Auto Recycling was assigned motorcycle dealer plate series 223 (MDC 223) under its junk dealer license and was issued supplemental plate number DA 223 as a part of that series.
Aetna argues that, as DA 223 is not part of the D 2564 series, it is not within the "one set of junk dealer plates" referred to as a covered vehicle in its endorsement. It is undisputed that the DA 223 plate was issued to Milford Auto Recycling under its junk dealer license. In fact, the Department of Motor Vehicle representative testified that the issuance of a plate from the dealer series did not make the plate a "dealer" plate but rather was done as a convenience to the Department so as to avoid the necessity of having a separate series of motorcycle plates reserved for junk dealers. (October 29, 1991 T. at 137). Thus, the Department of Motor Vehicles considered DA 223 to be a junk dealer plate and issued by them as such. "We accord great deference CT Page 9163 the construction of a provision given by the administrative agency charged with the provisions of enforcement." Preston v. Departmentof Environmental Protection, 218 Conn. 821, 830 (1991).
The Equifax Report, obtained by Aetna and referred to previously, disclosed that the "insured" had seven (7) junk dealer plates. This report had been part of the Aetna file since 1983, well before the date of the accident. (February 18, 1993 T. at 49). Aetna claims herein that the appropriate meaning of "one set of dealer junk plates" is that it consists of two plates, one for the front and one for the back, of the same vehicle. It is clear that the word "set", although indefinite as to number, denotes more than "one" component. Aetna's present assertion as to the meaning of the term "set", that is, two (2) plates for one vehicle, appears to be contradictory to the information in its own file. Certainly, a "set" may comprise more than two individual items, witness a set of plates, a set of books, a set of horseshoes, a set of keys and set of golf clubs.
Raymond Johnson, Jr. testified that he understood the term "set of plates" to refer to the supplemental plates issued to him under his junk dealer license. (May 14, 1992 T. at 66-67). This included the motorcycle plate which he understood to be issued to him pursuant to his junk dealer license. (May 14, 1992 T. at 66). In any event, if uncertainty or ambiguity existed in the meaning of the term "set", Aetna could have required that each and every plate issued under the junk dealer license be identified by number in the policy, a practice which would have avoided the very uncertainty here. Where an insurer has the opportunity to specify its coverage by exacting language, but fails to do so, the insurer must "bear the burden of any resulting confusion." Simses v. North AmericanLife and Health, supra at 89. "When the words of an insurance contract are, without violence, susceptible of two interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted." Raffel v. Travelers Indemnity Co.,141 Conn. 389, 392 (1954).
Finally, the Aetna policy contains "Endorsement CA 20 03" entitled "Dealer or Repairer Plates Insurance". This endorsement provides that:
 "Any auto you own while used with plates described in this endorsement is a covered auto, but only while:
1. Used in your garage business, or CT Page 9164
 2. Loaned to a customer whose auto is left with you for service or repair, or
 3. Used by you or your full time employees in personal affairs.
As the evidence established Johnson to be a full time employee of Milford Auto Recycling, Inc.; (May 14, 1992 T. at 132), and the motorcycle he was operating bore a plate secured through Milford Auto's junk dealer license and was owned by Milford Auto Recycling, Inc., the motorcycle would be a covered vehicle under Endorsement CA 20 03.
The court finds that the record contains substantial evidence to support the arbitrators' findings that Raymond Johnson, Jr. was an "insured under policy #143NS61034CAA issued by the Aetna Casualty and Surety Company" and that the motorcycle he was operating at the time of the accident was a covered vehicle under said policy. Furthermore, the court believes that these findings are in conformity with applicable case law.
Returning now to Aetna's first ground of error, the court will discuss its claim that its rights were prejudiced by the majority arbitrators' "refusal to state the factual and legal basis for their decision." Aetna raises this ground in regard to the arbitrators' findings that the "claimant (Johnson) was a covered insured and that the motorcycle he was riding was a covered vehicle."[3] Since arbitration of coverage issues is considered compulsory and pursuant to § 38a-336(c) is compulsory, no findings of fact or conclusions of law are required. American UniversalIns. Co. v. DelGreco, supra, 190-191. The DelGreco court went on to state:
 "Unless required by the submission, the decision of the arbitrator need contain no more than the actual decision, and need not make reference to the specific claims of the parties. An explanation of the means by which he has reached the award is not needed, and, in fact, has been held to be superfluous."
Accord, Berk Jainchill, Connecticut Law of Uninsured andUnderinsured Motorist Coverage, § 7.72 at p. 267.
The court would further point out that requiring the CT Page 9165 arbitrators to state the "factual and legal basis of their decision" would indeed be superfluous as, with respect to factual determinations, the court must conduct a complete review of the hearing transcript in order to determine whether substantial evidence exists to support the arbitrators' factual determinations. For this reason, § 38-175c requires that a complete record be made and preserved of the entire proceeding. A requirement that arbitrators in compulsory arbitration proceedings issue findings of fact would be useful only if the applicable standard was a de novo review of said findings. Such is not the case:
 "Indeed, a de novo scope of review of factual questions would be inconsistent with the purpose of the compulsory arbitration provision of that section (§ 38-175c), namely, avoiding congestion of the courts with piecemeal litigation and leveling the playing field by avoiding the risks that insurers would use their superior economic resources by subjecting contested claims for coverage, to undue litigation. To subject factual findings made by arbitrators under § 38-175c to de novo review by the court would, in many cases, make those proceedings merely way stations to the courts, and would thereby create the very risks that the compulsory arbitration provision was designed to avoid."
Chmielewski v. Aetna Casualty Surety Co., supra at 660.
With respect to Aetna's claim of prejudice due to the arbitrators' refusal to articulate the legal bases of their decision, the court finds such claim to be without merit. The law is clear that, in compulsory arbitration, the applicable standard requires that the "reviewing court conduct a de novo review of the interpretation and application of the law by the arbitrators." Id. This de novo review is undertaken on the record and the record discloses the claims of law made by and relied upon by the arbitrators.
Therefore, the court does not agree that Aetna has been prejudiced by the majority arbitrators' refusal to "state the factual and legal basis for their decision." The law does not require them to do so.
 "We find no merit in the contention . . . that the arbitrators imperfectly executed their powers because they did not make any specific findings with respect to CT Page 9166 all the claims of the parties.
 The arbitrators are only required to render an award in conformity to the submission and an award need contain no more than the actual decision of the arbitrators. The means by which they reach the award, unless the submission requires, is needless and superfluous."
Ramos Iron Works v. Franklin Construction Co., 174 Conn. 583, 589
(1978), quoting New Britain Machine Co. v. Lodge 1021, 143 Conn. 399,404, 122 A.2d 786. The submission in this case was under the terms and provisions of the Aetna policy, Endorsement CA 2X 17 which provides as follows:
 "B. We will pay all sums the insured is legally entitled to recover from the owner or driver of an uninsured motor vehicle . . . .
F. 4. ARBITRATION
 a. If we and the insured disagree whether the insured is legally entitled recover damages from the owner or driver of an uninsured motor vehicle or do not agree as to the amount of damages, either party may make a written demand for arbitration . . . ."
It is clear that the submission contains no conditions other than disagreement as to either the liability of the uninsured vehicle or the amount of damages required to fairly compensate the injury. Therefore findings of fact and law would not be required.
Insofar as Aetna claims that a lack of findings by the arbitrators is so prejudicial as to impede its constitutional due process right to be heard, the Second Circuit has held otherwise. In Lyeth v. Chrysler Corp., 929 F.2d 891 (2d. Cir. 1991)., the court addressed the defendant's due process attack based on the absence of a summary of the evidence and the reasons for the award from the arbitrator. The court rejected the constitutional claim, following the "established principle that an arbitrator is not required to state the reasons and grounds for his determination." The court concluded further that a search for an adequate basis for the award "from a reading of the record evidence" passes constitutional muster. CT Page 9167
The court will next consider Aetna's claim that the "arbitrators' decision should be vacated because the majority arbitrators were guilty of misconduct and violated their oath in refusing to consider [Aetna's] defense that the subject policy was void due to material misrepresentations made by the insured in the insurance application."
The burden rests on a party challenging an arbitration award on the ground of misconduct of the arbitrators to produce evidence of such misconduct. Twin Town Associates v. Gilbert Switzer Associates, 4 Conn. App. 538 (1985). The record here is completely void of any such evidence. Aetna's claimed defense of misrepresentation relates to the 1988 application for the Aetna policy and the absence of any mark in the "motorcycle box" response to an inquiry seeking the "number of autos owned by the applicant other than those being held for sale."
Aetna argues that because the motorcycle was purchased before the application was filled out, and was subsequently used in the business before being offered for sale in September of 1988, the failure to mark the "motorcycle box" amounted to a misrepresentation. The gravamen of Aetna's claim of misconduct is the arbitrators' "refusing to consider" the claimed misrepresentation. Nowhere in the record is there a statement by or in behalf of the arbitrators to that effect. In fact, no such claim is made even by the one dissenting arbitrator in her seven page "dissent". Aetna must concede that it is no more likely that the arbitrators refused to consider the misrepresentation defense than that the arbitrators considered the defense and found it unproven or unpersuasive.
In order for a misrepresentation to void a policy of insurance, the insurer must not only prove the representation to be false, but that the insured misrepresented, a material fact with the intention of deceiving the insurer. Rego v. ConnecticutInsurance Placement Facility, 219 Conn. 339, 346 (1991). No evidence is present in the record to support such a finding of an intent to deceive on the part of the insured. Clearly, Aetna's claim that the majority arbitrators were "guilty of misconduct and violated their oath" cannot be sustained.
Aetna's fifth ground for its motion to vacate is that material misrepresentations by the insured in its application for the policy should have voided the policy. The claimed misrepresentations consist of (1) the insured's failure to disclose the ownership of CT Page 9168 the motorcycle, and (b) the insured indicating on the application that it had "one" set of junk dealer plates. The meaning attached to the term "one set" by Aetna has been previously discussed. The court finds it reasonable for Johnson to have interpreted the statement "one set of dealer junk plates" to encompass the "set" of plates issued to him under his junk dealer license. Furthermore, Christopher Young, Director of Rules and Policy Forms with AIPSO, an organization providing service to the residual insurance markets, which include assigned risk plans, testified that if a particular risk came through the assigned risk plan, the carrier could not reject that risk or decline to insure the risk because it had seven pairs or sets of junk plates rather than one. Thus, the number of plates possessed by the named insured could not be held to be material to Aetna's decision to underwrite this risk. (March 29, 1993 T. at 36-37).
With respect to the motorcycle, the court views this issue as one caught up in the meaning of "one set of dealer junk plates". If, as Johnson believed, any vehicle issued a plate by the Department of Motor Vehicles under and pursuant to the named insured's junk dealer license, would be covered under the aforementioned language, then he would not have felt it necessary to identify the motorcycle on the application. In any event, there is no evidence that Johnson wilfully failed to disclose the motorcycle with the intention of deceiving the insurer. Rego v.Conn. Insurance Placement Facility, supra. Nor is there evidence that the disclosure of the motorcycle would have been material to Aetna's undertaking or not undertaking the issuing of the policy. In fact, Melvin Dunlop, an Aetna underwriter, testified that the application which Aetna points to as containing the alleged misrepresentations had no effect upon the policy that was in effect between November 28, 1987 and November 28, 1989, which included the date of the accident. (February 18, 1993 T. at 57).
The Aetna policy rated and charged separate premiums based on coverage for a 1977 Ford truck and "one set of junk dealer plates". Separate premiums were paid for uninsured motorist coverage of $300,000, $70 for the truck and $57 for the junk dealer plates. Aetna claims that the arbitrators erred in stacking the coverage on each "vehicle" to provide $600,000 in coverage. Aetna looks toCohn v. Aetna Insurance Co., 213 Conn. 525 (1990) as authority for its position. In Cohn, the court held that stacking the coverage on a number (21) of individually listed vehicles in a business automobile liability policy to arrive at the total amount of coverage would be beyond the reasonable expectations of the parties and CT Page 9169 is inappropriate in the context of fleet (emphasis added) automobile liability policies. Cohn, supra at 530. Aetna points also to its policy which, in Endorsement CA 2X 17 Section E, states: Our Limit of Liability. "Regardless of the number of covered autos, insureds, claims made or vehicles included involved in the accident, the most we will pay for all damages resulting from any one accident is the limit of uninsured motorist insurance shown in the declarations." Aetna argues that since the declaration showed $300,000 in coverage, the arbitrators were in error in stacking the coverage to $600,000.
The arbitrators had before them the last page of the policy entitled "Auto Change Endorsement", where two boxes appear in the right lower corner entitled "fleet" and "non-fleet). The "non-fleet" box is checked.
Aetna's arguments cannot prevail. Kent v. Middlesex AssuranceCo., 226 Conn. 427, 433 (1993).:
 "Once is has been established that an insurer is obligated to stack the under insured motorist coverage in the policy, as it is when separate, additional premiums have been paid for coverage in two vehicles, the insurer may not reduce its liability for such aggregated coverage even through explicit policy language, except within the narrow context of the exceptions permitted under § 38-175a-6(d) of the Regulations of Connecticut State Agencies."
Since Aetna's policy is a non-fleet policy and, as two separate premium charges were paid for uninsured motorist coverage on separate "vehicles", and the limiting language of Aetna's policy is not authorized by § 38-175a-6(d), the arbitrators were correct in stacking or aggregating policy coverage to total $600,000.
Aetna's final argument in support of vacating the arbitrator's decision is that it was based upon "partiality" of the majority arbitrators. This court does not agree.
The record reflects substantial evidence for the finding of the following facts. On September 16, 1988, Raymond C. Johnson, Jr. was operating a 1978 Harley-Davidson motorcycle, owned by the named insured, Milford Auto Recycling, Inc., in a northerly direction on Rogers Avenue in Milford. On the motorcycle was a license plate bearing the number DA 223 issued by the Commissioner CT Page 9170 of Motor Vehicles to the named insured pursuant to its junk dealer license.
Just prior to the accident, witness Richard Abbot, an acquaintance of Johnson's, saw Johnson ride by his home and waved to Johnson. Johnson waved back. Abbot estimated the speed of the motorcycle as it passed him at 20-25 miles per hour; the motorcycle had "its big headlight on" and Johnson was "driving the motorcycle properly". The motorcycle then rounded a bend and shortly thereafter, Abbot heard a crash.
Linea Peterson, who testified, saw the accident while looking out of her picture window as the accident occurred directly in front of her house:
 "I could see it happen right in front of my eyes. I saw the motorcycle hit the back of the car as that person came sharply into my driveway. She came in front of him and he had no choice but to hit her. He had no place to go. He hit her in the back, and he went flying and the motorcycle went flying.
 The girl said `I didn't see him.' I did not see a signal light on the car. She did not stop before making the turn."
The car was being operated by Allison Bache in a southerly directly immediately prior to the collision and suddenly swerved left without signaling across the northbound lane in the path of the motorcycle to enter the driveway at 30 Rogers Avenue. The motorcycle had no chance to avoid the accident. The impact occurred in the northbound lane at a point just north of the driveway. Raymond Johnson testified that he could see the car coming for a distance of about 300 feet. Suddenly, when the car was about 40 feet in front of him, it turned in his path. He could not stop and struck the rear of the car. He never saw a signal light.
Sergeant Harrington of the Milford Police Department arrived at the scene and placed the location of the motorcycle 106 feet from the point of impact. Johnson was on the highway between the point of impact and the motorcycle. Allison Bache's automobile was blocking the northbound lane and was partially in the driveway at 30 Rogers Avenue. In Sergeant Harrington's opinion, Johnson was coherent and in great pain and was not intoxicated at the time of CT Page 9171 the accident. Nor did he smell liquor on him.
As a result of the accident, according to Dr. Michael Baumgaertner, an orthopedic specialist, Johnson was severely injured. His injuries consisted of a markedly displaced, open fracture of the right femur, a closed fracture of the lateral malleolus, fracture of the mediotarsal bone requiring pinning, fracture of the tibia involving the joint surface, with significant damage to the joint, torn cruciate ligaments in the right knee, and severe post traumatic arthritis of the knee and ankle joints.
Dr. Baumgaertner testified that in his opinion Mr. Johnson had sustained a permanent partial disability equal to 47% of the right lower extremity. Also, Johnson would probable need a total knee replacement in the future at today's, cost for surgery, hospitalization and post-op care of $36,264, and that if he (Johnson) were to live to be 75 — 80, he would need a second knee replacement. There is also a 25 — 50% chance that Johnson will need an ankle fusion at a total cost of $15,904.
Johnson incurred medical, surgical and hospital bills in the amount of $112,163.09.
At the time of the incident, Allison Bache maintained an automobile liability policy with a $20,000 limit with Aetna Life and Casualty Company. The parties stipulated that Aetna had paid the entire policy proceeds over to Johnson, thereby exhausting the policy.
Johnson testified that he had been drinking during supper about one and a half hours prior to the accident and had consumed "almost a whole pint of bourbon". A blood alcohol determination at Yale-New Haven Hospital where Johnson was brought revealed a reading of .243. David Blythe, an accident reconstructionist, testifying for Aetna estimated the motorcycle's speed just prior to impact to be at least 38 miles per hour. Johnson's accident reconstructionist William S. Vliet, estimated that the speed of the motorcycle just before impact was in the area of 25 miles per hour. At the time of the accident, Johnson was insured under Aetna policy no. 134NA61034 CAA issued to Milford Auto Recycling, Inc., the named insured. The motorcycle Johnson was driving at the time of the accident was an insured vehicle under the policy.
Johnson was also an insured under policy no. 02-W50-009 issued to Johnson's parents by National Grange Mutual Insurance Co. as CT Page 9172 Johnson resided with his parents at 39 Kenmore Lane in Milford. The Aetna policy was primary as Johnson was driving a vehicle insured by Aetna at the time of the accident.
Aetna argues that the blood alcohol reading of .243 at the hospital when coupled with the speed of 38 miles per hour estimated by an accident reconstructionist should have necessarily led the arbitrators to conclude that Johnson's contributory negligence exceeded the negligence of Allison Bache, thus denying him a recovery. The court does not agree. The arbitrators had before them the testimony of an eyewitness who saw the Bache vehicle swerve directly into the path of Johnson's motorcycle without signalling her intention to turn. They had the testimony of another witness who, immediately before the accident, saw the motorcycle proceeding properly at a modest rate of speed. They had the testimony of an investigating officer who testified that Johnson was coherent at the scene of the accident with no sign of intoxication.
The majority arbitrators concluded that "Raymond C. Johnson, Jr.'s injuries as proven were proximately caused by the negligence of one Allison Bache and the claimant Raymond C. Johnson Jr. was 50% contributorily negligent." The court believes that 50% is a generous discount under these facts as apart from the testimony of David Blythe as to minimal slowing of reaction times at the blood alcohol level of .243, there is no testimony that Johnson's alcohol intake or speed was a proximate cause of the accident. The court finds further that the arbitrators' finding that Johnson was legally entitled to recover monetary damages of $900,000 less his comparative fault of 50% and further reduced by the tortfeasor's payment of $20,000 is reasonable and justified by the severe nature of the injuries and disabilities suffered by Johnson.
Claimant's Exhibit 22 is a letter which, standing alone, supports the arbitrators' findings that Johnson is an insured under the Aetna policy and that the motorcycle is a covered vehicle. It is printed here in its entirety:
 AETNA Commercial Insurance Division Casualty Processing Center 116 Baldwin Street Elmira, New York 14901 (607) 733-5581
January 10, 1989 CT Page 9173
 Aetna Life Casualty Claims Department Hartford Branch Attn: Ann Robertson 1 Civic Center Plaza Hartford, CT 06103
 Re: Milford Auto Recycling Policy Number: 134 NA 61034 CAA
Dear Ann:
 I have discussed the use of a junk plate attached to a motorcycle with the Connecticut Department of Motor Vehicles.
 The junk plate has coverage under the insured's policy when attached to a motorcycle, only if the insured is the operator. There is no coverage if the motorcycle is operated by anyone else. Therefore, we must make sure that on the date of the loss, September 16, 1988, the insured was the operator of the motorcycle.
 If there is any further information needed, please feel free to contact me.
Sincerely,
 Mel Dunlop Senior Analyst 607-733-5581
In summary, the court must conclude that the record does not contain a scintilla of evidence to support a claim of arbitrator partiality.
The court finds substantial evidence exists in the record to support the arbitrators' findings and further finds that the applicable law supports the decision of the majority arbitrators.
The court finds further that the decision of the majority arbitrators conforms to the submission of the parties.
Therefore, Aetna's Application to Vacate, Modify and/or CT Page 9174 Correct the Arbitration Award in the matter of Aetna Casualty andSurety Co. v. Johnson is denied.
Raymond C. Johnson, Jr.'s Application to Confirm the Award of Damages by the Arbitrators in the matter of Johnson v. AetnaCasualty and Surety Co. is granted.
Raymond C. Johnson, Jr.'s Application to Conditionally Vacate or Modify the Arbitration Award against National Grange Mutual Insurance in the matter of Johnson v. National Grange MutualInsurance Co. is denied.
Raymond C. Johnson, Jr.'s request for interest is denied.
The court, pursuant to § 52-420(c) of the Connecticut General Statutes now enters judgment in the amount of $430,000 in favor of Raymond C. Johnson, Jr. as against the Aetna Casualty and Surety Co. in conformity with the decision of the arbitrators.
Skolnick, J.